**UNITED STATE DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

**LACAZE LAND DEVELOPMENT, LLC**
*Plaintiff*

**v.**                                          **CIVIL ACTION NO.:1:19-cv-01477**

**DEERE & COMPANY, INC. and**
**W. L. DOGGETT, LLC d/b/a**
**DOGGETT MACHINERY SERVICES**          **CHIEF JUDGE DEE D. DRELL**
*Defendants*                                   **MAG. JUDGE PEREZ-MONTES**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**ON BEHALF OF DEERE & COMPANY, INC.**


COTTEN SCHMIDT, L.L.P.
PAUL M. LAVELLE (08134)
CODY J. ACOSTA (37005)
650 Poydras Street, Suite 1950
New Orleans, LA  70130
Telephone:  (504) 568-9393
Facsimile:  (504) 524-1933
plavelle@cottenschmidt.com
cacosta@cottenschmidt.com

**ATTORNEYS FOR DEERE & COMPANY, INC**

## TABLE OF CONTENTS – MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION…………………..…...…………………………...1

II.     THE STANDARD FOR GRANTING SUMMARY JUDGMENT….2

III.    THE EVIDENCE IS UNSUFFICIENT TO SUSTAIN PLAINTIFF'S REDHIBITION CLAIM…………………………………………………3

    1.  The Plaintiff's redhibition claims related to the mulching head attachment are prescribed……………………………………………………………..8

    2.  Deere owes no warranty for conditions that were made known to the Plaintiff prior to the sale……………………………………………………………9

    3.  The Plaintiff is unable to satisfy his burden of proof to show that any other complained-of conditions were attributable to defects arising from Deere's manufacture of the product……………………………………………………10

        a.  The turbo hose issues…………………………………………12

        b.  Hydraulic switch issues……………………………………………12

        c.  Fuel Rail Pressure Sensor…………………………………………13

        d.  Hydraulic pump issues………………………………………15

        e.  Manifold quick connect coupler issues………………………………...16

        f.  Intake hose issues……………………………………………..18

        g.  Water pump, fan speed and solenoid issues……………………………19

        h.  There is no evidence to support a finding that the machine caught fire due to any redhibitory defect………………………………………..21

IV.     THE EVIDENCE IS INSUFFICIENT TO SUSTAIN PLAINTIFF'S REQUEST TO RESCIND THE SALE……………………………22

V.      PLAINTIFF'S "NEGLIGENT REPAIR" CLAIMS AGAINST DEERE MUST BE DISMISSED………………..………………24

VI.     CONCLUSION……………………………………………………..24

## **TABLE OF AUTHORITIES**

**Statutes**

La. Civ Code art. 2520 ................................................................................................................. 23

La. Civ. Code art. 2521 ................................................................................................................... 9

La. Civ. Code art. 2520. ............................................................................................................ 4, 22

La. Civ. Code art. 2534 ................................................................................................................... 9

La. Civ. Code art. 2541 ................................................................................................................. 23

La. Civ. Code art. 2545 ................................................................................................................. 22

La. R.S. 9:2800.52 ......................................................................................................................... 24

La. R.S. 9:2800.53 ......................................................................................................................... 24

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................. 2, 3

**Cases**

*Aucoin v. Southern Quality Homes, LLC*, 984 So. 2d 685 (La. 2008). ......................................... 4

*Breen v. Texas A&M University*, 485 F.3d 325 (5th Cir. 2007) ................................................... 2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 2

*Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*, 457 So. 2d 255 (La. App. 3d Cir. 1984).. 5, 11

*Duffie v. United States*, 600 F.3d 362 (5th Cir. 2010) ................................................................. 3

*Edelman Systems, Inc. v. Capitol GMC, Inc.*, 345 So. 2d 99 (La. App. 1st Cir. 1977) ............... 5

*Fidele v. Crescent Ford Truck Sales, Inc.*, 786 So. 2d 147 (La. App. 5th Cir. 2001) .................. 6

*Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388 (5th Cir. 2006) ..................................................... 3

*Gradney v. Chandeleur Homes, Inc.*, 900 So. 2d 282 (La. App. 3d. Cir. 2005). ........................ 4

*Green v. Benson and Gold Chevrolet*, 811 So. 2d 970 (La. App. 5th Cir. 2002) ........................ 6

*In re Ark-La-Tex Timber Company, Inc.*, 482 F.3d 319 (5th Cir. 2007) ..................................... 3

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS 113447  (E.D. La. 7/9/19) ......... 23

*Jordan v. Security Co.*, 425 So. 2d 333 (La. App. 3d Cir. 1982) ............................................ 4, 5

*Jordan v. Security Co.*, 425 So. 2d 333 (La. App. 3d Cir. 1982) ................................................ 4

*Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.*, 315 So. 2d 660 (La. 1975)... 4, 5, 8, 10-11, 16

*Napoli v. Gully*, 509 So. 2d 798 (La. App. 1st Cir. 1987). ........................................................ 23

*Oliver v. Chrysler Corp.*, 510 So. 2d 1320 (La.App.3d Cir. 1987) ........................................... 19

*Peyton v. Charvet's Garden Center*, 427 So. 2d 592 (La. App. 5th Cir. 1983) .......................... 5

*Rivera v. Houston Independent School District*, 349 F.3d 244 (5th Cir. 2003) ........................... 2

*Stroderd v. Yamaha Motor Corp., U.S.A.*, 2005 U.S. Dist. LEXIS 17797  (E.D. La. 8/4/05) ................... 24

*Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636 (5th Cir. 1999). ................................................ 3

*Turner v. Baylor Richardson Medical Center*, 476 F.3d 337 (5th Cir. 2007) ............................. 3

*Whitt v. Stephens County*, 529 F.3d 278 (5th Cir. 2008) ........................................................... 3

## I.      Introduction

Plaintiff, Lacaze Land Development, LLC ("Lacaze"), seeks to rescind the sale of a 2018 John Deere 333G Skid Steer Compact Track Loader for the machine's purchase price, expenses, interest, damages, and attorney's fees. On November 14, 2019 Lacaze sued Deere & Company, Inc. (the manufacturer of the machine) and W.L. Doggett, LLC, who sold the machine to the Plaintiff in August 2018. Lacaze has asserted several redhibition claims related to both the 2018 Skid Steer as well as a mulching attachment that the Plaintiff had purchased sometime in 2017. Plaintiff is seeking rescission of the sales of both the mulching head and the 333G loader.[1]

The John Deere 333G ("333G") is a compact track loader that uses a diesel engine, turbo and hydraulic system to perform a variety of forestry and construction-related tasks. Lacaze purchased the 333G from Doggett for total "cash price" of $86,835 together with sales tax in the amount of $6,860.06 on August 31, 2018. However, unlike most other equipment sales, the Plaintiff was allowed extensive use of this machine prior to this sale's closing as it had been previously loaned to the Plaintiff by Doggett after the Plaintiff's previous 333G Skid Steer Compact Track Loader had suffered a total loss due to fire in June 2018.

Plaintiff has the burden of proof in showing that each of the complained-of redhibitory defects existed at the time of the machine's sale or delivery to the dealer in order to recover against Deere. However, the Plaintiff is unable to satisfy his burden of proof in this matter; he has no direct evidence to support any finding that these complaints were due to some defect that existed at the time of the machine's manufacture or at the time it was initially delivered to Doggett, and he likewise is unable to proffer sufficient circumstantial evidence that "excludes other reasonable

---

[1] Record Document 1 Plaintiff's Complaint

hypotheses with a fair amount of certainty."   Deere is therefore entitled to the dismissal of all claims asserted against it.

## II.      The standard for granting summary judgment

Rule 56 authorizes and governs the disposition of motions for summary judgment. The rule mandates that a granting of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A massive body of jurisprudence has arisen regarding its application. What follows is a summary of several of those principles, along with a brief explanation of their relevance to this motion.

First, as a general rule, the moving party has the initial burden under Rule 56 of establishing that there are no issues of material fact and that it is entitled to judgment in its favor as a matter of law. *Breen v. Texas A&M University*, 485 F.3d 325, 331 (5th Cir. 2007); *Rivera v. Houston Independent School District*, 349 F.3d 244, 246-47 (5th Cir. 2003).   But the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion. Only disputed facts that might affect the outcome of the lawsuit under governing law will preclude summary judgment. *Condiff v. R.D. Werner Company, Inc.*, 2003 WL 21977167, *1 (E.D. La. 2003). In addition, a moving party can win summary judgment by simply pointing the court to the total absence of evidence supporting one element of a non-movant's claim, if the non-movant will bear the burden of proof on that claim at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Second, once the mover's initial burden is satisfied, the opposition must then "go beyond the pleadings and by [their] own affidavits, or by [some other allowable means] and must designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, *quoting* Fed. R. Civ. P. 56(e); *In re Ark-La-Tex Timber Company, Inc.*, 482 F.3d 319 (5th Cir. 2007). A

fact is material for purposes of summary judgment only when it might affect the outcome of the suit under the governing law, and a fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party based on the evidence submitted. *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). Thus, the plaintiff cannot simply rest on the allegations in his pleadings: "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999).

Third, conclusory allegations and unsubstantiated assertions unsupported by specific facts will not prevent granting of summary judgment; the plaintiff cannot rest on allegations alone to get to a jury. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010), *cert. denied* 562 U.S. 897, 131 S. Ct. 355, 178 L.Ed.2d 149 (2010); *Turner v. Baylor Richardson Medical Cente*r, 476 F.3d 337, 345 (5th Cir. 2007); *Whitt v. Stephens County*, 529 F.3d 278, 283 n. 8 (5th Cir. 2008). In fact, the Fifth Circuit requires the nonmoving party to tender what it has called "significant" and "probative" evidence in order to rebut a properly-supported summary-judgment motion. *Whitt*, 529 F.3d at 283 n. 8.

**III.    The evidence is insufficient to sustain Plaintiff's redhibition claims**

Under Louisiana law, sellers and manufacturers are liable to purchasers for defects that are "redhibitory." To be "redhibitory," a "defect" must either (a) "render[] the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect"; or (b) "without rendering the thing totally useless, … diminish[] its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." La. Civ. Code art. 2520.

3

Just as with any other civil action, a plaintiff complaining of redhibitory defects bears the ultimate burden of proof. Although a plaintiff "need not necessarily introduce expert testimony" nor "seek out, allege and prove the underlying cause of the defects which make the thing sold unfit," "it is still necessary that he prove the existence of a defect at the time of the sale," *Jordan v. Security Co.*, 425 So. 2d 333, 335 (La. App. 3d Cir. 1982), or – in the case of a redhibition claim against a manufacturer – at the time of the thing's delivery to the seller. *Aucoin v. Southern Quality Homes, LLC*, 984 So. 2d 685, 693 (La. 2008). To satisfy that burden, a claimant may rely on circumstantial evidence. *Gradney v. Chandeleur Homes, Inc.*, 900 So. 2d 282, 285-86 (La. App. 3d. Cir. 2005). If he does so, however, his circumstantial evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.*, 315 So. 2d 660, 662 (La. 1975). If it does not, then the plaintiff has failed to establish a prima facie case in redhibition under Louisiana law.

For example, in *Jordan v. Security Co.*, 425 So. 2d 333 (La. App. 3d Cir. 1982), the court held that a plaintiff's testimony that a shotgun he purchased repeatedly "hung up" was insufficient to establish a prima facie case in redhibition. A plaintiff in redhibition "need not necessarily introduce expert testimony" nor "seek out, allege and prove the underlying cause of the defects which make the thing sold unfit," the court acknowledged, but "it is still necessary that he prove the existence of a defect at the time of the sale." *Id.* at 335. The plaintiff's proof in *Jordan* consisted of "his own testimony and the testimony of his hunting partner," which established that the gun had malfunctioned on more than one occasion. *Id.* The defendant, however provided expert testimony that "explained many ways in which the gun could malfunction in this manner without the gun being defective," including "operator error, short loading, improper maintenance and care, and intentional jamming." *Id*. Notably, the expert testimony did not establish which of those "many

4

ways" more likely than not caused the malfunction, but the court held that "the malfunctioning of the gun, *i.e.*, 'hanging up' in itself does not establish that the gun is defective" and that plaintiff had failed to establish a prima facie case in redhibition:

> The testimony of [plaintiff and his hunting companion] merely established that the gun "hung up." Within the factual context of this case, fair inferences may be drawn from such malfunctions other than the gun is defective. For example, the gun becoming "hung up" could have resulted from improper loading. To allow [plaintiff] to establish a prima facie case on such evidence places an undue burden on [the defendant] who has no personal knowledge as to the acts preceding the malfunction.

*Id.*

Subsequent jurisprudence has confirmed *Jordan's* holding. Louisiana case law establishes that where, within the factual context of a case, a product's malfunctioning allows for "fair inferences" other than that the product is inherently defective, the plaintiff must exclude those other fair inferences with a "fair amount of certainty." *Moreno's, Inc.*, 315 So. 2d at 662. If the plaintiff does not, the defendant is entitled to judgment. S*ee, e.g., Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*, 457 So. 2d 255 (La. App. 3d Cir. 1984) (automobile seller entitled to judgment; evidence showed merely that car burned within days of sale and "inferences other than that the car is defective may be drawn"); *Peyton v. Charvet's Garden Center*, 427 So. 2d 592 (La. App. 5th Cir. 1983) (browning of sod "a few days subsequent" to sale and later discovery of "bug infestation" insufficient to sustain redhibition claim because "bugs could just as easily have migrated from anywhere in the neighborhood"); *Edelman Systems, Inc. v. Capitol GMC, Inc.*, 345 So. 2d 99 (La. App. 1st Cir.), writ denied, 347 So. 2d 250 (La. 1977) (repeated truck malfunctions and need for repairs did not establish redhibitory defect where repairs "may have" resulted from, among other things, wear, "improper work performed by third persons" or "improper maintenance"); *Green v. Benson and Gold Chevrolet*, 811 So. 2d 970 (La. App. 5th Cir.), writ denied, 817 So. 2d 96 (La. 2002) (affirming involuntary dismissal – "plaintiff proved that she

experienced problems with the vehicle which began almost immediately after she purchased it," but her witnesses did not know cause of problems and no "expert testimony or evidence at trial [established] that a defect existed in the vehicle or that the repairs were necessitated by any defect"); *Fidele v. Crescent Ford Truck Sales, Inc.*, 786 So. 2d 147 (La. App. 5th Cir. 2001) (affirming involuntary dismissal where evidence described a host of problems beginning "shortly after" purchase of vehicle, because "[t]here are some hypotheses which are suggested which are reasonable and that is that [plaintiff's] lack of maintenance of this vehicle could have caused the problems").

In this case, Deere is entitled to summary judgment dismissing Plaintiff's redhibition claim because, as a matter of law, the evidence is insufficient to show that the "issues" complained of by the Plaintiff for the 333G are attributable to "defects" at all, let alone defects resulting from the original manufacture of the product. In particular, Deere has introduced the report and testimony of its expert, Mr. Steven Wienkes, in further support of this motion.  Plaintiff has not retained an expert to rebut this testimony.

Mr. Wienkes not only had the opportunity to inspect the 333G and mulching head attachment, but also the machine's JDLink data. That inspection and data contained in the machines system indicated "that the machine was poorly maintained and was operated contrary to instructions and warnings provided by the manufacturer, including indications that the machine was operated for long durations of time with warning lights being ignored."[2]

Finally, based upon his review of the data and materials provided, his inspection of the machines, his education and industry experience, Mr. Wienkes opined, to a reasonably degree of engineering certainty, that:

---

[2] Wienkes Report, Exhibit A-1, at p. 5.

1. The 333G and mulching head attachments were not defective in design or manufacture;
2. The subject 333G machine had not been properly maintained by the Plaintiff since the date of sale; and
3. Mr. Lacaze operated . . . this machine without following the manufacturer's instructions and guidance.[3]

Mr. Wienkes elaborated on these findings during his deposition:

The only [repairs] . . . that may not have been [related to Lacaze's improper maintenance and operation] were that there was a turbo hose that was replaced. There was a switch or two replaced.

That may not have been directly related to it. But when I refer to it as possibly being related is when you run a machine in a fashion that Mr. Lacaze was running it where you're running high temperatures –

There was indication that there was high pressures. The pump was at a high pressure at some point. That substantially reduces the life of a lot of the components of the machine. When you exceed the temperatures, other parts of the machine can be affected by temperature indirectly. So it may bring those to a shorter lifespan.

When you have airflow restriction on the engine, you're making the engine work a lot harder to do the same work. And that creates an undue burden on the engine and possibly severe damage to the engine if dust gets into it. But in the meantime, it's throwing off the air flow ration so the machine cannot function correctly.

You have the teeth of the mulching head that should be sharpened every morning. And if they're dull it takes a lot more to do the mulching. So in the video I've seen on social media where he's pushing this machine to the wood, he's just tearing it up and not really doing a so-called mulching practice.

He's running it to exceed its capacity where you hear the wheel – the drum slowing down in speed and the engine laboring instead of backing up and let the wheels pull up and let the engine run the way it wants to run.

So all of these things contribute to a lot of these repairs being done. The contamination in the oil for the pumps, we have within the first three hours of the machine, it was brought back in to replace hoses and the hydraulic system was all opened up. And the wiper motor had been damaged.

It didn't say specifically but typically that would be from letting large objects fall in front of the cab and damaging the machine. And the hydraulic system is a closed system, but once you open it up you have the potential of debris.

---

[3] Wienkes Report, Exhibit A-1, at p. 5.

You have the hoses of the mulching machine that are sitting close to the ground. So the practice of whether he wipes those off and puts in the cupular is another potential.

But it's apparent by what I've seen in the machine, in the condition of the coolers, the coolant flow, just general overall condition, it's not being cleaned out properly and not maintained as it should be.[4]

Thus, although Louisiana's jurisprudence does allow a Plaintiff to proceed on a redhibition claim with only circumstantial evidence, such evidence must, within the factual context of this case, exclude other fair inferences that may account for the issue with a "fair amount of certainty." *Moreno's, Inc.*, 315 So. 2d at 662. If the plaintiff does not, the defendant is entitled to judgment.

This is just such a case; Deere has proffered significant evidence in the form of the repair records, JDLink data, report of Mr. Wienkes, and deposition testimony that all raise fair inferences that these complained-of issues were not the result of a redhibitory defect. As the Plaintiff is unable to exclude these fair inferences in opposition to this motion, Deere respectfully suggests that summary judgment is warranted.

1. **The Plaintiff's redhibition claims related to the mulching head attachment are prescribed**

On page six of this complaint, the Plaintiff claims that a redhibitory defect existed in the mulching head attachment that he used with the Skid Steer.[5] In deposition, the Plaintiff testified that this attachment was the same mulching attachment it used with its prior John Deere 333G Skid Steer.[6] In fact, the Plaintiff testified that it had experienced "repetitive mulching pump failure inside the head" on several occasions, including instances prior to the August 31, 2018 sale of the

---

[4] Wienkes Deposition, Exhibit B, pp. 151-153
[5] R. Doc. 1., p. 6 ("Repeat damage to mulcher (Deere model MH60c), including multiple replacements of the mulcher motor").
[6] Deposition of Lacaze Land Development, LLC, Exhibit C p. 65, ll. 4-7.

333G at issue in this action.[7] Thus, the Plaintiff was aware of these alleged "repetitive mulching pump failure[s]" from at least August 31, 2018, which is the date of sale for the Skid Steer at issue.

Under La. Civ. Code art. 2534, a redhibition action against a manufacturer "prescribes in one year from the day the defect is discovered by the buyer." Because this action was filed more than one year following the Plaintiff's admitted discovery of any issues related to the mulching head attachment, any claims in redhibition associated with the sale of the mulching head attachment are necessarily prescribed and must be dismissed.

**2.  Deere owes no warranty for conditions that were made known to the Plaintiff prior to the sale**

Article 2521 of the Civil Code provides that a seller "owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things." This article is significant because the Plaintiff had the opportunity to use and operate the machine for approximately forty-five days prior to the sale according to the business records of Doggett. As a result, Deere owes no warranty for any issues that would have been observed by a reasonably prudent buyer during this "loaner" period of the device.

In this case, the service records maintained by Doggett establish that the first two complained of conditions outlined within this complaint were made known to this Plaintiff prior to the date of sale, August 31, 2018. Specifically, on page 5 of the complaint, the Plaintiff lists the following items, which it contends are redhibitory defects:

    a.  Multiple active codes requiring software updates for DCU and programming of DCU, EMJ and HYD;

    b.  Wiper motor binding requiring replacement with new wiper motor[8]

---

[7] Deposition of Lacaze Land Development, LLC, Exhibit C p. 65, ll. 10-22.
[8] R. Doc. 1., p. 5

The codes referred to by plaintiff are tools to assist in operation and maintenance of the machine. Software updates are to improve performance. These are not redhibitory defects. Furthermore, the business records maintained by Doggett establish the Plaintiff was made actually aware of these alleged issues with the software and windshield wipers prior to this sale. In particular, on or about July 31, 2018, Doggett updated the software for the machine during a field repair at no cost to the Plaintiff,[9] and the windshield wiper issues were first reported by the Plaintiff to Doggett on August 27, 2018.[10] Therefore, because the Plaintiff was made aware of the windshield wiper issues prior to the date of this sale, Deere owed no warranty in redhibition related to the condition of the windshield wiper motor and blades. None the less, both of these items were repaired without cost to Plaintiff.  As such, to the extent the Plaintiff seeks to recover in redhibition against Deere for the windshield wiper motors or the need to update this machine's software, such claims fail as a matter of law. Finally, notwithstanding the fact that the Plaintiff was made aware of the wiper blade issues prior to this sale, any claims related to the wiper blades must nevertheless be dismissed as Deere has put forth evidence that raises the inference that wiper issues were the result of the operation of the machine, not due to some defect in manufacture or design.[11]

### 3. The Plaintiff is unable to satisfy his burden of proof to show that any other complained-of conditions were attributable to defects arising from Deere's manufacture of the product

Louisiana case law establishes that where, within the factual context of a case, a product's malfunctioning allows for "fair inferences" other than that the product is inherently defective, the plaintiff must exclude those other fair inferences with a "fair amount of certainty." *Moreno's, Inc.*, 315 So. 2d at 662. If the plaintiff does not, the defendant is entitled to judgment. S*ee, e.g.,*

---

[9] Exhibit D In Globo P.4.
[10] Exhibit D In Globo P. 8.
[11] Wienkes Deposition, Exhibit B p. 153, ll. 2-6 ("And the wiper motor had been damaged. It didn't say specifically but typically that would be from letting large objects fall in front of the cab and damaging [sic] the machine.").

*Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*, 457 So. 2d 255 (La. App. 3d Cir. 1984) (automobile seller entitled to judgment; evidence showed merely that car burned within days of sale and "inferences other than that the car is defective may be drawn"). In this case, the Plaintiff's complaints and evidence is insufficient to show any defects existed at the time of the machine's sale, let alone sufficient to exclude other non-redhibitory explanations for the complained-of issues.

To the contrary, as explained by Mr. Wienkes, there is plenty of evidence of improper maintenance and operation. The physical condition of the machine revealed its overall conditions with damage from a rear impact that interfered with the cooling components and allowed debris to accumulate, fluid levels, such as coolant being empty and the air filter overdue for replacement, dull teeth on the mulching head all indicative of causes for high operating temperatures which in return prevent the machine from operating properly and shortens the lifespan of its component parts.

Taking a closer look at specific issues Plaintiff alleges in his complaint as examples of redhibitory defects it becomes clear that Plaintiff cannot meet their evidentiary burden in this case and contrarily cannot exclude the non-redhibitory explanations offered by Mr. Wienkes.

Plaintiff lists a number of alleged defective conditions on Page 5 and Page 6 of its complaint related to the JDLink data codes, software, wiper motor, hydraulics, mulcher, fan motor and seals. All through these conditions, Plaintiff was continually using this machine. Mr. Lacaze testified the mulcher was constantly in use eight to ten hours a work day.[12] With this heavy use and the lack of proper maintenance, there can be no doubt that the improper operation and maintenance is the cause of plaintiff's complaints, and it can offer no competent evidence to

---

[12] Deposition of Lacaze Land Development, LLC, Exhibit C Page 58, ll. 17 to Page 59 l. 1.

exclude these non-redhibitory explanations.  The JDLink data shows that there were times when the machine was operated for hours while a warning to the operator advised of coolant issues that needed to be addressed.  These warnings were ignored.

### a.   The turbo hose issues

Plaintiff lists an issue with the turbo hose.[13]  A review of Doggett's service records show that after almost 300 hours of use something punctured the hose.[14]  Doggett later examined the engine and surrounding area and determined that a hose in the cooling system area had actually been punctured.[15]  A hose being punctured after extensive use of the machine in a manner that allows debris to enter can hardly be called a redhibitory defect.

There is no genuine issue of material fact that the turbo noise issues alleged within this complaint are not redhibitory in nature as they did not exist at the time of this sale or the machine's manufacture. The service records clearly establish that the machine had been used for nearly three hundred hours by the time the Plaintiff first noticed any "strange noises" coming from the engine's turbo, and the Plaintiff's own testimony clearly establishes that it wasted no time in bringing these issues to Doggett's attention for diagnostics and repair.[16] Thus, the Plaintiff is unable to satisfy its burden of proof in showing that the turbo issues are redhibitory in nature, and such claims necessarily must be dismissed.

### b.  Hydraulic switch issues

Plaintiff also complains about a hydraulic switch.  That was reported in the JDLink data and repaired at no cost to plaintiff.  On page five of this complaint, the Plaintiff claims that a

---

[13] R. Doc. 1, p. 5.
[14] Exhibit D In Globo P. 19.
[15] *Id.*
[16] Lacaze Deposition Exhibit C Page 42, ll. 3-4 ("Any time I had an issue, I immediately called for service or brought the machine in.").

redhibitory defect existed in this machine's hydraulic switch, which required replacement.[17] However, the Plaintiff is unable to offer any competent summary judgment evidence that any issues related to the hydraulic switch existed at the time of the machine's manufacture or sale.

In fact, the machine's JDLink data establish that the first registered code related to the hydraulic filter switch occurred on or about February 15, 2019, and the machine had recorded 262.8 hours of use at that time.[18] Doggett's service records show that first recorded complaint by the Plaintiff regarding any hydraulic restriction codes occurred on or about February 19, 2019, when Doggett was again called on for repairs to this machine.[19] After diagnosing the issue, Doggett determined that the hydraulic filter restriction switch was "not operating" and replaced the switch to correct the issue at no cost to plaintiff.[20]

There is no genuine issue of material fact that the hydraulic filter switch was operating correctly for the first 262.7 hours of this machine's use, and the Plaintiff is unable to offer any evidence that would indicate the failure of this switch was due to any defect that existed at the time of this machine's manufacture or sale. Thus, the Plaintiff's redhibition claims related to the machine's hydraulic switch must be dismissed.

### c.  Fuel Rail Pressure Sensor

Again, on page five of this complaint, the Plaintiff also claims that a redhibitory defect existed in this machine's fuel rail pressure sensor, which allegedly required software updates.[21]

---

[17] R. Doc. 1, p. 5 ("Hydraulic switch not working properly and requiring replacement"). The Plaintiff makes a similar allegation on page 6: "Active codes showing switch not operating properly, and needing to be replaced.") R. Doc. 1, p. 6.
[18] Exhibit A-2, JD Link Data, at p. 15.
[19] Exhibit D in Globo p. 17.
[20] *Id.*
[21] R. Doc. 1., p. 5 ("Loud noise coming from turbo requiring replacement of a hose that had a hole in it and the turbo boot; repeat issues with the hose occurred").

However, the Plaintiff is unable to satisfy its burden of proof in showing fuel rail pressure issues existed at the time of this machine's manufacture or sale.

On or about June 7, 2019, the machine first registered and recorded an error code related to the fuel rail pressure.[22] That error code was recorded at 366.9 hours of machine use,[23] and on or about June 8, 2019, the Plaintiff returned the machine to Doggett to diagnose "fuel issues" he had been experiencing.[24] After diagnosing the issue, Doggett updated the software for the EMU, engine, and HCU components.[25] After updating the software for these items, the stored fuel issue codes disappeared, and Doggett then ran the machine "for over an hour and it never once threw a code nor did the pressure get distinctly low on the high-pressure side."[26] Doggett then reprogrammed the DCU with new software and completed its work.[27]  Once again, there was no cost to plaintiff for this work.

On or about August 5, 2019, the machine again recorded a string of error codes related to the fuel rail pressure.[28] At that time, the machine had recorded 520.9 hours of use.[29] On or about August 12, 2019, the Plaintiff returned the machine to Doggett for diagnosis of issues related the system fuel rail pressure.[30] After diagnosing the problem, Doggett determined that the fuel rail pressure sensor had failed, replaced the failed part, and then ran the machine after exchanging the part.[31]

---

[22] Affidavit of Steven Wienkes, Exhibit A-2, JD Link Data, at p. 15.
[23] Affidavit of Steven Wienkes, Exhibit A-2, JD Link Data, at p. 15.
[24] Exhibit D in Globo p. 23.
[25] *Id.*
[26] Exhibit D in Globo pp. 23-24.
[27] *Id.*
[28] Affidavit of Steven Wienkes, Exhibit A-2, JD Link Data, at p. 14.
[29] Affidavit of Steven Wienkes, Exhibit A-2, JD Link Data, at p. 14.
[30] Exhibit D in Globo pp. 34-35.
[31] Exhibit D in Globo, pp. 34-35.

Thus, there is no genuine issue of material fact that the fuel rail pressure sensor was operating correctly for the first 366.9 hours of this machine's use, and the Plaintiff is unable to offer any evidence that would indicate the circumstances precipitating the need to update the machine's fuel sensor software or replace this sensor was due to any defect that existed at the time of this machine's manufacture or sale. Thus, the Plaintiff's redhibition claims related to the fuel rail pressure sensor must be dismissed.

### d.  Hydraulic pump issues

On page six of the complaint, the Plaintiff also claims that a redhibitory defect existed in this machine's hydraulic system, including the failure of a hydraulic pump.[32] However, the Plaintiff is unable to satisfy its burden of proof in showing the hydraulic system issues existed at the time of this machine's manufacture or sale.

On or about June 24, 2019, the Plaintiff again returned his machine to Doggett to diagnose issues with the machine's hydraulics.[33] At that time, the machine had recorded approximately 408 hours of use.[34] Doggett proceeded to then run the machine and confirmed the Plaintiff's complaint by checking the system's hydraulic pressure.[35] Doggett determined that the hydraulic pump had failed and "contaminated the entire system."[36]

A sample of hydraulic oil was obtained during this process and submitted for analysis.[37] That sample showed there was a "heavy concentration of water present" within the hydraulic oil, and that high degree of water contamination prevented any particle count analysis.[38] Furthermore,

---

[32] R. Doc. 1., p. 6 ("Machine having weak hydraulics from Hydraulic pump failure causing contamination of the whole system and requiring replacement of hydraulic pump, fan motor, manifold and related parts").
[33] Exhibit D in Globo p. 25.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Exhibit E, Fluid Analysis UIN 06B5D30 of Mr. Harold Scarborough.
[38] *Id.*

that water contamination within hydraulic fluid is significant as it can contribute to the "failure of hydraulic pumps and motors."[39] As a result, Doggett rebuilt the machine's hydraulic system with new components.[40]

Therefore, in order to satisfy its prima facie burden of proof, the Plaintiff must come forward with some evidence that excludes the "fair inference" that the failure of the hydraulic pump, and the resulting contamination of the system, was due to the water contamination present within the hydraulic oil. *Moreno's, Inc.*, 315 So. 2d at 662. As with all of his allegations of defect, the Plaintiff is unable to satisfy this burden of proof, and summary judgment dismissing the Plaintiff's redhibitory claims must be granted.

### e.  Manifold quick connect coupler issues

On page six of this complaint, the Plaintiff also claims that a redhibitory defect existed in this machine's manifold quick connect coupler, which was allegedly replaced "multiple times."[41] However, the Plaintiff is unable to offer any competent summary judgment evidence that any defect existed within the machine's auxiliary manifold quick connect coupler at the time of the machine's manufacture or sale.

First, the service records maintained by Doggett establish that the there was reported "damage to auxiliary connections on boom and head" as of August 30, 2018, and a new "manifold and connected lines" were installed, along with new couplings, at the time.[42]

Second, the damage to the connection on the boom was likely caused by plaintiff during the period he used the machine as a loaner.

---

[39] Deposition of Mr. Steven Wienkes, Exhibit B p. 166, ll. 4-7; Fluid Analysis UIN 06B5D30 (Exhibit E)
[40] Exhibit D in Globo p. 34
[41] R. Doc. 1., p. 6 ("Machine having weak hydraulics from Hydraulic pump failure causing contamination of the whole system and requiring replacement of hydraulic pump, fan motor, manifold and related parts").
[42] Exhibit D in Globo p. 8.

The auxiliary manifold was replaced by Doggett a second time during its rebuild of the hydraulic system in June 2019 as discussed above.[43] There is a fair inference that the hydraulic system rebuild in June 2019 was ultimately necessitated by the water contamination found within the hydraulic system, and the Plaintiff is unable to offer any evidence that would suggest that the manifold replacement in June 2019 was due to any redhibitory defect.

Third, the auxiliary manifold was again replaced by Doggett on or about October 7, 2019. By that point in time, the machine had recorded approximately 647 hours of use, and the Plaintiff's primary complaint was that the machine was overheating and losing hydraulic pressure.[44] After inspecting the machine, Doggett "found that there was a blown seal on the manifold."[45] Doggett then installed a new quick coupler on the device and checked hydraulic pressure to confirm the machine was operating properly.[46] However, the Plaintiff is unable to offer any evidence that would suggest the replaced manifold's seal failure more than one year following the sale of the machine was due to any redhibitory defect. In addition, the fact that this manifold coupler was replaced subsequent to the date of sale necessarily requires a finding that any subsequent issues attendant thereto were not redhibitory in nature as this manifold coupler was not even present on the machine at the time of this sale.

Thus, the Plaintiff is unable to satisfy its burden of proof in showing any redhibitory defects existed in the auxiliary manifold on this machine at the time of sale and delivery on August 31, 2018; there are no genuine issues of material fact that the manifold was actually replaced by Doggett shortly before delivery to the Plaintiff pursuant to the act of sale, and the Plaintiff is likewise unable to put forth any evidence that subsequent replacement of the manifold during the

---

[43] Exhibit D in Globo pp. 39-40
[44] Exhibit D in Globo p. 40.
[45] *Id.*
[46] Exhibit D in Globo, pp. 40-41.

June 2019 rebuild of the hydraulic system was due to any other reason beyond the severe levels of water contamination found within the hydraulic oil. Finally, Deere owes no warranty for any parts that may have been incorporated into this machine by Doggett following the act of sale, so any redhibition claim related to the October 2019 replacement of the quick connect coupler must likewise be dismissed.

### f. Intake hose issues

On page six of the complaint, the Plaintiff also claims that a redhibitory defect existed in this machine's "intake hose."[47] However, the Plaintiff is unable to offer any competent summary judgment evidence that any defect existed within the machine's "intake hose" at the time of the machine's manufacture or sale.

In fact, the first reported instance of any issues with this "intake hose" occurred on or about August 19, 2019, nearly one year following the sale of this machine.[48] By that point in time, the machine had recorded 527 hours use, and the Plaintiff returned the machine to Doggett to assess a "rubbed charge air cooler line."[49] Doggett then installed a new hose and clamps, at no cost to the Plaintiff, to correct the issue.[50]

The Plaintiff is unable to offer any evidence that would suggest the "rubbing" of this hose was the result of any redhibitory defect or otherwise due to any condition that existed in the machine at the time of this sale. Finally, Louisiana jurisprudence specifically countenances that products will undergo "ordinary wear and tear" such as this following a sale, and the Plaintiff cannot rely upon such minimal inconveniences to unlock the serious remedy of avoidance of a sale

---

[47] R. Doc. 1., p. 6 ("Intake hose from charge air cooler to the intake manifold rubbing and about to rub through requiring replacement of the hose").
[48] Exhibit D in Globo p. 72-73.
[49] *Id.*
[50] *Id.*

under the redhibition articles. *C.f.  Oliver v. Chrysler Corp.*, 510 So. 2d 1320, 1323 (La.App.3d Cir. 1987) ("in an action in redhibition, the purchaser is not entitled to rescission of the sale and recovery of the purchase price unless he is in a position to return the purchased item in substantially the same condition as when sold, ordinary wear and tear excepted.").

### g.   Water pump, fan speed and solenoid issues

On page six of this complaint, the Plaintiff also claims that a redhibitory defect existed in this machine due to "overheating caused by bad water pump and requiring replacement of water pump."[51] The Plaintiff also claims that a redhibitory defect existed in this machine's fan and solenoid coil.[52] That said, the Plaintiff's own complaint belies any conclusion that the solenoid coil itself contained any redhibitory defect as the Plaintiff affirmatively alleges the coil's damage was caused by a "pressure relief val[v]e."[53] However, the Plaintiff is unable to offer any competent summary judgment evidence that any defect existed within the machine's "water pump," fan or pressure relief valve at the time of the machine's manufacture or sale. Plaintiff cannot exclude the non-redhibitory explanations related to maintenance and improper operation as the cause of this issue.

The first reported instance of overheating issues came on or about September 3, 2019.[54] At that time, the machine had registered approximately 594 hours of use.[55] After examining the machine, Doggett determined that the system's fan was not coming up to speed and that the water pump for the unit had failed.[56] Doggett determined that the fan's solenoid and coil parts had failed

---

[51] R. Doc. 1., p. 6.
[52] R. Doc. 1, p. 6.
[53] *Id.*
[54] Exhibit D in Globo p. 36-37.
[55] *Id.*
[56] *Id.*

due to a failed pressure relief valve.[57] Doggett then installed a new pressure relief valve and new solenoid coil and then confirmed the fan was operating at the desired revolutions per minute following replacement of those parts.[58] In addition to its work on the fan issues, Doggett also replaced the water pump, gasket for the water pump, thermostat and thermostat gasket. After performing these repairs, Doggett then "ran the machine to ensure no leaks nor overheating issues."[59]

The Plaintiff is unable to offer any evidence that would suggest these issues on or about September 2019 were the result of any redhibitory defects at the time of the August 31, 2018 sale; by this point in time, the machine had been used for nearly six hundred hours, and there is no reasonable basis to allow for an inference that a problem that occurs after nearly six hundred hours of use is due to some condition that existed at the time of this sale. Furthermore, Deere has introduced evidence, in the form of its expert report and deposition, that many of the issues complained of in this action, including the issues with this water pump, were potentially related to the Plaintiff's failure to properly maintain and operate the machine. "It's apparent by what I've seen in the machine, the condition of the coolers, the coolant flow, just general overall condition, it's not being cleaned out properly and not maintained as it should be."[60]

No competent evidence establishes, or even suggests, that any issues existed with the machine's water pump at the time of the manufacture, and Deere has introduced evidence in the form of its' expert report and expert testimony that these issues were the result of the Plaintiff's own negligent conduct in failing to properly maintain the machine. As such, summary judgment

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *See* Deposition of Mr. Wienkes, Exhibit B pp. 151-153

dismissing Plaintiff's claims for redhibitory defects related to the machine's water pump is necessary and appropriate.

### h.  There is no evidence to support a finding that the machine caught fire due to any redhibitory defect

On page six of this complaint, the Plaintiff also claims that the machine caught fire "in the belly pan" due to a redhibitory defect.[61] Just as with the other complained-of conditions, the Plaintiff is unable to offer any competent summary judgment evidence that any defect existed within the machine at the time of this machine's manufacture or sale that contributed to or caused this fire; as a result, summary judgment dismissing such claims is appropriate.

The 333G operator's manual provides guidance and instructions to owners on the best practices to prevent fire. For example, the manual advises 333G owners to clean their machines regularly.[62] In particular, owners are advised to "[k]eep flammable debris (trash, leaves, twigs, straw, etc), grease, and oil from accumulating in engine compartment, around fuel lines, hydraulic lines, exhaust components, and electrical wiring."[63] Despite receiving this operator's manual and these warnings, there is no genuine issue of material fact that the Plaintiff failed to adhere to these fire-prevention guidelines.

For example, on or about February 4, 2019, Doggett conducted a field repair on this machine at the Plaintiff's request.[64] Upon arrival, Doggett examined the machine's internal components and discovered that the high flow solenoid valve stem had "trash stuck in it."[65] Less than one month later, the Plaintiff returned the machine to Doggett to assess hydraulic issues. After removing the floor plan, Doggett noted that "inside the machine was full of debris. A large stick

---

[61] R. Doc. 1, p. 6.
[62] Affidavit of Steven M. Wienkes, Exhibit A-3, John Deere 333G Operator's Manual, section 1-2-6, at p. 19.
[63] *Id.*
[64] Exhibit D in Globo p. 15.
[65] *Id.*

had come through and broke the solenoid."[66] Furthermore, Mr. Wienke's inspection of the machine on October 15, 2020 revealed "debris of various size and type spread around the engine compartment."[67]

The Plaintiff must come forward with some evidence that excludes the fair inference that this fire was the result of the Plaintiff's own failure to keep the machine clear of flammable debris; however, the Plaintiff is unable to satisfy this burden. There is no evidence the Plaintiff may point to that would suggest this fire was caused by some defect in the 333G, let alone a defect that existed at the time of the machine's manufacture or sale. As a result, the Plaintiff's redhibition claim related to the fire must be dismissed.

### IV.    The evidence is insufficient to sustain Plaintiff's request to rescind the sale

Finally, Deere is entitled to judgment as a matter of law dismissing Plaintiff's claim under La. C.C. 2545 for the rescission of the 333G and mulcher attachment sales, a refund of the purchase prices, with interest, costs associated with the sale and the machine's preservation, and damages. Not only is the Plaintiff unable to proffer sufficient evidence to establish the existence of any redhibitory defects in this matter, but rescission of the sale is only appropriate for those cases where the evidence establishes that a redhibitory defect "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." La. Civ Code art. 2520.

"If a defect does not render the thing totally useless, it may still be redhibitory if the defect 'diminishes its usefulness or values so that it must be presumed that a buyer would still have bought it but for a lesser price.'" *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS

---

[66] *Id.*
[67] Affidavit of Steven M. Wienkes, Exhibit A-1, at p. 4.

113447, at *31 (E.D. La. 7/9/19) (Milazzo, J.) (quoting La. Civ. Code art. 2520). Furthermore, "[i]t is of no moment that the plaintiff buyer who files suit to rescind a sale testifies that he would not have purchased the thing if he would have known of the vice." *Napoli v. Gully*, 509 So. 2d 798, 799 (La. App. 1st Cir. 1987). Instead, the appropriate test for determining if rescission is appropriate is whether "a reasonable person would have still purchased the thing if he had known of the defect." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS 113447, at *31 (citing *Napoli v. Gully*, 509 So. 2d 798, 799 (La. App. 1st Cir. 1987)). Thus, the Civil Code authorizes this Court to "limit the remedy of the buyer to a reduction of the price" where appropriate.

In this case, the summary judgment evidence establishes that this is not an appropriate matter for rescission. Mr. Wienkes testified that the 899.6 hours of use recorded by the machine at the time of his inspection was not "remarkable with regard to the age of this machine and the use of it."[68] Furthermore, the Plaintiff testified that it used this machine "every day of [the] work week" and "eight to ten" hours per day "whenever it was running."[69] Because the evidence fails as a matter of law to establish that the putative "defects" within these machines rendered them absolutely useless or so "inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect," La. Civ Code art. 2520, Deere is entitled to judgment dismissing Plaintiff's claim for rescission of the sale and alternatively, an order limiting Plaintiff's recovery, if any, to a reduction of the purchase price pursuant to La. Civ. Code art. 2541.

---

[68] Wienkes Deposition, Exhibit B p. 52, ll. 21-24.
[69] Deposition of Lacaze Land, Exhibit C p. 58, ll. 17-21; p. 59, ll. 2-4.

V.      **Plaintiff's "Negligent Repair" claims against Deere must be dismissed**

Deere additionally moves for summary judgment on all "negligent repair" claims levied by the Plaintiff against it. First, Louisiana law does not allow a Plaintiff to litigate directly against a manufacturer for allegedly negligent repairs made by a dealership as such a claim necessarily is subsumed by Louisiana's Products Liability Act ("LPLA"). The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52. "Damage" is defined by the LPLA as "damage to the product itself **and economic loss arising from a deficiency in or loss of use of the product only to the extent that [a redhibition cause of action] does not allow recovery for such damage or economic loss**." La. R.S. 9:2800.53(5). In *Stroderd v. Yamaha Motor Corp., U.S.A.*, 2005 U.S. Dist. LEXIS 17797, *5 (E.D. La. 8/4/05), the Eastern District dismissed a "negligent repair" claim against a defendant manufacturer as the negligence claim was not one of redhibition nor authorized by the exclusive provisions of the LPLA. This Court should follow *Stoderd's* lead and dismiss Plaintiff's "negligent repair" claims against Deere as a matter of law.

Second, notwithstanding the fact that any potential "negligent repair" claim is precluded by the exclusive provisions of the LPLA, such claims against Deere must nevertheless be dismissed as the Plaintiff is unable to offer any competent summary judgment evidence that would indicate Deere performed any repairs on any of the devices at issue in this case.

VI.     **Conclusion**

Plaintiff operated this machine from before the date it was purchased.  He operated the machine in rough conditions and damaged the cooling components by a collision that impacted the rear of the machine.  The use was rough enough to damage connectors on the boom, puncture a hose and damage a wiper motor.  The machine was not properly maintained. Yet, the hours of

use at high operating temperatures and pressures kept growing.  The improper operation and disregard for maintenance are the reasons for the issues plaintiff alleges as defects.

There is no evidence to point to a redhibitory defect.  There is no expert engineer to testify to a defect. There is no breach of warranty.  Furthermore, to the extent the Plaintiff raises any claims related to his prior purchase of the mulching head attachment, such claims are prescribed. Deere is entitled to the entry of summary judgment dismissing Plaintiff's claims against it, with prejudice and at Plaintiff's costs.

<div style="margin-left:40%">

Respectfully submitted,
**/S/  PAUL M. LAVELLE**
**PAUL M. LAVELLE (08134)**
CODY J. ACOSTA (37005)
Cotten Schmidt, L.L.P.
650 Poydras Street, Suite 1950
New Orleans, LA  70130
Telephone:  (504) 568-9393
Facsimile:   (504) 524-1933
plavelle@cottenschmidt.com
cacosta@cottenschmidt.com
</div>

**ATTORNEYS FOR DEERE & COMPANY, INC.**

**Dated: January 28, 2021**